In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2719

Arnold R. Rissman,

Plaintiff-Appellant,

v.

Owen Randall Rissman and Robert Dunn Glick,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 3656--Blanche M. Manning, Judge.

Argued April 7, 2000--Decided May 23, 2000


Before Bauer, Easterbrook, and Rovner, Circuit Judges.

Easterbrook, Circuit Judge.  Gerald Rissman formed Tiger Electronics to make toys and games. In 1979 Gerald gave his sons Arnold, Randall, and Samuel large blocks of stock in the firm: Gerald kept 400 shares and gave Randall 400, Arnold 100, and Samuel 100. In 1986 both Gerald and Samuel withdrew from the venture. Tiger bought Gerald's stock, and Arnold bought Samuel's, leaving Randall with 2/3 of the shares and Arnold with the rest. Randall managed the business while Arnold served as a salesman. Arnold did not elect himself to the board of directors, though Tiger employed cumulative voting, which would have enabled him to do so. When the brothers had a falling out, Arnold sold his shares to Randall for $17 million. Thirteen months later, Tiger sold its assets (including its name and trademarks) for $335 million to Hasbro, another toy maker, and was renamed Lion Holdings. Arnold contends in this suit under the federal securities laws (with state-law claims under the supplemental jurisdiction) that he would not have sold for as little as $17 million, and perhaps would not have sold at all, had Randall not deceived him into thinking that Randall would never take Tiger public or sell it to a third party. Arnold says that these statements convinced him that his stock would remain illiquid and not pay dividends, so he sold for whatever Randall was willing to pay. Arnold now wants the extra $95 million he would have received had he retained his stock until the sale to Hasbro.

Because the district judge granted summary judgment to the defendants, see 1999 U.S. Dist. Lexis 10611 (N.D. Ill.), we must assume that Randall told Arnold that he was determined to keep Tiger a family firm. Likewise we must assume that Randall secretly planned to sell after acquiring Arnold's shares. But we need not assume that Arnold relied on Randall's statements (equivalently, that the statements were material to and caused Arnold's decision), and without reliance Arnold has no claim under sec. 10(b) or Rule

10b-5. See 15 U.S.C. sec. 78j(b); 17 C.F.R. sec. 240.10b-5; Basic, Inc. v. Levinson, 485 U.S. 224, 243 (1988). Arnold asked Randall to put in writing, as part of the agreement, a representation that Randall would never sell Tiger. Randall refused to make such a representation. Instead he warranted (accurately) that he was not aware of any offers to purchase Tiger and was not engaged in negotiations for its sale. Contrast Jordan v. Duff & Phelps, Inc., 815 F.2d 429 (7th Cir. 1987). The parties also agreed that if Tiger were sold before Arnold had received all installments of the purchase price, then payment of the principal and interest would be accelerated. Having sought broader assurances, and having been refused, Arnold could not persuade a reasonable trier of fact that he relied on Randall's oral statements. See Karazanos v. Madison Two Associates, 147 F.3d 624, 628-31 (7th Cir. 1998). Having signed an agreement providing for acceleration as a consequence of sale, Arnold is in no position to contend that he relied on the impossibility of sale.

Indeed, Arnold represented as part of the transaction that he had not relied on any prior oral statement:

The parties further declare that they have not relied upon any representation of any party hereby released [Randall] or of their attorneys [Glick], agents, or other representatives concerning the nature or extent of their respective injuries or damages.

That is pretty clear, but to foreclose quibbling Arnold made these warranties to Randall:

(a) no promise or inducement for this Agreement has been made to him except as set forth herein; (b) this Agreement is executed by [Arnold] freely and voluntarily, and without reliance upon any statement or representation by Purchaser, the Company, any of the Affiliates or O.R. Rissman or any of their attorneys or agents except as set forth herein; (c) he has read and fully understands this Agreement and the meaning of its provisions; (d) he is legally competent to enter into this Agreement and to accept full responsibility therefor; and (e) he has been advised to consult with counsel before entering into this Agreement and has had the opportunity to do so.

Arnold does not contend that any representation in the stock purchase agreement is untrue or misleading; his entire case rests on Randall's oral statements. Yet Arnold assured Randall that he had not relied on these statements. Securities law does not permit a party to a stock transaction to disavow such representations--to say, in effect, "I lied when I told you I wasn't relying on your prior statements" and then to seek damages for their contents. Stock transactions would be impossibly uncertain if federal law precluded parties from agreeing to rely on the written word alone. "Without such a principle, sellers would have no protection against plausible liars and gullible jurors." Carr v. CIGNA Securities, Inc., 95 F.3d 544, 547 (7th Cir. 1996).

Two courts of appeals have held that non-reliance clauses in written stock-purchase agreements preclude any possibility of damages under the federal securities laws for prior oral statements. Jackvony v. RIHT Financial Corp., 873 F.2d 411 (1st Cir. 1989) (Breyer, J.); One-O-One Enterprises, Inc. v. Caruso, 848 F.2d 1283 (D.C. Cir. 1988) (R.B. Ginsburg, J.). Several of this

circuit's opinions intimate agreement with these decisions, though we have yet to encounter a situation squarely covered by them. See SEC v. Jakubowski, 150 F.3d 676, 681 (7th Cir. 1998); Pommer v. Medtest Corp., 961 F.2d 620, 625 (7th Cir. 1992); Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp., 910 F.2d 1540, 1545-46 (7th Cir. 1990). Jackvony and One-O-One fit Arnold's claim like a glove, and we now follow those cases by holding that a written anti-reliance clause precludes any claim of deceit by prior representations. The principle is functionally the same as a doctrine long accepted in this circuit: that a person who has received written disclosure of the truth may not claim to rely on contrary oral falsehoods. See Carr and, e.g., Associates In Adolescent Psychiatry, S.C. v. Home Life Insurance Co., 941 F.2d 561, 571 (7th Cir. 1991); Dexter Corp. v. Whittaker Corp., 926 F.2d 617, 620 (7th Cir. 1991); Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 530 (7th Cir. 1985). A non-reliance clause is not identical to a truthful disclosure, but it has a similar function: it ensures that both the transaction and any subsequent litigation proceed on the basis of the parties' writings, which are less subject to the vagaries of memory and the risks of fabrication.

Memory plays tricks. Acting in the best of faith, people may "remember" things that never occurred but now serve their interests. Or they may remember events with a change of emphasis or nuance that makes a substantial difference to meaning. Express or implied qualifications may be lost in the folds of time. A statement such as "I won't sell at current prices" may be recalled years later as "I won't sell." Prudent people protect themselves against the limitations of memory (and the temptation to shade the truth) by limiting their dealings to those memorialized in writing, and promoting the primacy of the written word is a principal function of the federal securities laws.

Failure to enforce agreements such as the one between Arnold and Randall could not make sellers of securities better off in the long run. Faced with an unavoidable risk of claims based on oral statements, persons transacting in securities would reduce the price they pay, setting aside the difference as a reserve for risk. If, as Arnold says, Randall was willing to pay $17 million and not a penny more, then a legal rule entitling Arnold to an extra $95 million if Tiger should be sold in the future would have scotched the deal (the option value of the deferred payment exceeds 1), leaving Arnold with no cash and the full risk of the venture. Arnold can't have both $17 million with certainty and a continuing right to 1/3 of any premium Randall negotiates for the firm, while bearing no risk of loss from the fickle toy business; that would make him better off than if he had held his shares throughout.

Negotiation could have avoided this litigation. Instead of taking the maximum Randall was willing to pay unconditionally, Arnold could have sought a lower guaranteed payment (say, $10 million) plus a kicker if Tiger were sold or taken public. Because random events (or Randall's efforts) would dominate Tiger's prosperity over the long run, the kicker would fall with time. Perhaps Arnold could have asked for 25% of any proceeds on a sale within a year, diminishing 1% every other month after that (so that Randall would keep all proceeds of a sale more than 62 months after the transaction with Arnold). Many variations on this formula were possible; all would have put Randall to the test, for if he really

planned not to sell, the approach would have been attractive to him because it reduced his total payment. Likewise it would have been attractive to Arnold if he believed that Randall wanted to sell as soon as he could receive more than 2/3 of the gains. Yet Arnold never proposed a payment formula that would share the risk (and rewards) between the brothers, and the one he proposes after the fact in this litigation--$17 million with certainty and a perpetual right to 1/3 of any later premium--is just about the only formula that could not conceivably have been the outcome of bargaining.

Arnold calls the no-reliance clauses "boilerplate," and they were; transactions lawyers have language of this sort stored up for reuse. But the fact that language has been used before does not make it less binding when used again. Phrases become boilerplate when many parties find that the language serves their ends. That's a reason to enforce the promises, not to disregard them. People negotiate about the presence of boilerplate clauses. The sort of no-reliance clauses that appeared in the Rissmans' agreement were missing from other transactions, such as the ones in Astor Chauffeured Limousine and Acme Propane, Inc. v. Tenexco, Inc., 844 F.2d 1317 (7th Cir. 1988). Still other transactions, such as the one discussed in LHLC Corp. v. Cluett, Peabody & Co., 842 F.2d 928 (7th Cir. 1988), include "strict reliance" clauses, entitling one party to rely on every representation ever made by the other. Arnold could have negotiated for the elimination of the no-reliance clauses, or the inclusion of a strict-reliance clause, but in exchange he would have had to accept a price lower than $17 million. Judges need not speculate about the reason a clause appears or is omitted, however; what matters when litigation breaks out is what the parties actually signed.

Contractual language serves its functions only if enforced consistently. This is one of the advantages of boilerplate, which usually has a record of predictable interpretation and application. If as Arnold says the extent of his reliance is a jury question even after he warranted his non-reliance, then the clause has been nullified, and people in Arnold's position will be worse off tomorrow for reasons we have explained. Rowe v. Maremont Corp., 850 F.2d 1226 (7th Cir. 1988), on which Arnold principally relies, does not assist him. Maremont contended that as a matter of law no oral representations survive a written contract; we rejected that conclusion in Rowe, 850 F.2d at 1234, and again in Astor Chauffeured Limousine, but in neither Rowe nor Astor Chauffeured Limousine had the parties included a no-reliance warranty in their written agreement. Arnold, by giving Randall such a warranty, put himself in a different position.

Only one case offers Arnold even a glimmer of support: Contractor Utility Sales Co. v. Certain-Teed Products Corp., 638 F.3d 1061, 1083 (7th Cir. 1981), concluded that an integration clause did not preclude reliance on prior fraudulent statements under the common law of Pennsylvania. To the extent that Contractor Utility Sales rests on a belief that state law allocates issues between judge and jury in diversity litigation (for the opinion cites only state cases in the critical passages), it has been overtaken by subsequent decisions. See Mayer v. Gary Partners & Co., 29 F.3d 330 (7th Cir. 1994) (overruling a line of cases that applied state law to determine which issues must be presented to juries). To the extent that Contractor Utility Sales states a proposition of federal practice, it does not extend beyond simple

integration clauses--and must be deemed of doubtful validity even with respect to them, given the wealth of later decisions such as Jackvony, One-O-One, Angelos, and Carr. But we need not decide whether this aspect of Contractor Utility Sales is sound, for the agreement between Arnold and Randall contained the clauses set out above, in addition to an integration clause. Perhaps the parties added the language to make sure that Contractor Utility Sales could not be used to upset their deal. No matter their motives, however, their language forecloses any damages based on oral representations.

In order to get anywhere, Arnold must rid himself of the no-reliance clauses, and to this end he argues that the entire stock-sale agreement is voidable because signed under duress. The parties agree that Illinois law supplies the definition of duress. Arnold contends that he signed under duress because:

Randall threatened to fire him from his job at Tiger.

His stock was illiquid and worthless unless Randall could be persuaded to buy it (or to sell Tiger), and Randall threatened never to buy the stock if Arnold caused trouble.

He feared that Randall would cause Tiger to stop reimbursing the shareholders for taxes that had to be paid on Tiger's profits. (Tiger became a Subchapter S corporation in 1991, so its profits were taxable to the shareholders. Part of the 1991 agreement required Tiger to distribute dividends equal to the shareholders' tax obligations, and Arnold professes fear that Randall would not honor this commitment.) Late in 1996 Randall caused Tiger to eliminate cumulative voting, depriving Arnold of the entitlement to elect himself to the board.

Glick told Arnold that he would be subject to penalties if he revealed confidential information to third parties in order to stir up acquisition bids.

Tiger filed suit against Arnold in an Illinois court to resolve a dispute about Arnold's right to review Tiger's corporate records.

Randall (according to Arnold) threatened to "drag him through the courts forever" unless Arnold sold his stock.

The district court concluded that none of these assertions calls into question the validity of the agreement under Illinois law, and we agree.

Illinois defines duress as "a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances which deprive him of the exercise of his free will". Curran v. Kwon, 153 F.3d 481, 489 (7th Cir. 1998), quoting from Kaplan v. Kaplan, 25 Ill. 2d 181, 185, 182 N.E.2d 706, 709 (1962). The essential question is whether a "threat has left the individual bereft of the quality of mind essential to the making of a contract." Kaplan, 25 Ill. 2d at 186, 182 N.E.2d at 709. Arnold was of sound mind and readily could understand his options. He had legal and financial advice--and, despite what Arnold now says, he had many alternatives to the sale. He could, for example, have

dissented from the decision to eliminate cumulative voting and demanded that Tiger repurchase his stock at a price to be set by a neutral appraiser. 805 ILCS 5/11.65(a)(3)(iii), 5/11.70. This was his absolute right; it did not depend on demonstrating that elimination of cumulative voting was "oppressive" or the like. If he thought $17 million too low, he had only to present that position to the state judiciary. Likewise with his fear that Tiger would stop distributing the money necessary to cover taxes on its profits. Tiger's failure to keep its promises would have led to a remedy in state court, and Arnold's lawyers surely could have informed him that although litigation (including the records-access suit then under way) may seem to last "forever," it ends much faster. At oral argument Arnold's lawyer said that Arnold wanted to avoid risk; after all, the appraisal might have concluded that his stock was worth less than $17 million. True enough; many sensible people want to curtail risk (and all litigation is risky); but that objective could not be achieved if courts refused to enforce agreements like the one between Arnold and Randall, for then litigation would be the only way to resolve disputes. No legal system can accept an assertion that "this contract was signed under duress because my only alternative was a lawsuit." That would eliminate settlement--and to a substantial degree the institution of contract itself.

This is not to say that a remote possibility of litigation as an alternative to settlement always scotches a claim of duress. Illinois uses formulaic words such as "free will," but when forced to choose it applies a functional approach under which opportunistic exploitation of options that contracts were designed to foreclose equals duress. The party that performs first incurs sunk costs, which the other may hold hostage by demanding greater compensation in exchange for its own performance. The movie star who sulks (in the hope of being offered more money) when production is 90% complete, and reshooting the picture without him would be exceedingly expensive, is behaving opportunistically. The classic case, though not from Illinois, is Alaska Packers' Ass'n v. Domenico, 117 F. 99 (9th Cir. 1902) (admiralty). After a fishing vessel reached a remote location, the crew refused to work (and threatened to sail home) unless paid double the wage to which they had agreed immediately before leaving port. The court held that the vessel owner's promise to double the wage was unenforceable because obtained under duress: the remote location and lack of an alternate crew had enabled the sailors to behave opportunistically. See also Varouj A. Aivazian, Michael J. Trebilcock & Michael Penny, The Law of Contract Modifications: The Uncertain Quest for a Benchmark of Enforceability, 22 Osgoode Hall L.J. 173 (1984); Timothy J. Muris, Opportunistic Behavior and the Law of Contracts, 65 Minn. L. Rev. 521 (1981). No one would have thought that the owner's ability to file a lawsuit could have helped; the fishing season would be over before the case could be adjudicated, and the seamen might have been judgment-proof anyway. Illinois cases holding that particular agreements were made under duress because litigation was not a feasible alternative are in the same vein. See People ex rel. Carpentier v. Daniel Hamm Drayage Co., 17 Ill. 2d 214, 161 N.E.2d 318 (1959); Kaplan v. Keith, 60 Ill. App. 3d 804, 377 N.E.2d 279 (1st Dist. 1978). But for Arnold litigation (especially an appraisal action under which a state court would have compelled Tiger to buy his shares for their full value) would have been a sensible option.

People under indictment for murder, and facing the death penalty, may settle their dispute and avoid the risk with a guilty plea and a term of imprisonment. North Carolina v. Alford, 400 U.S. 25 (1970). People facing discharge at an advanced age may agree to early retirement and resolve their dispute with a severance package. See Henn v. National Geographic Society, 819 F.2d 824 (7th Cir. 1987). Neither the criminal defendant nor the older worker may accept the benefits of the bargain and later seek to avoid the detriments on the theory that unpleasant options mean duress. In each situation litigation offers a civilized, and proper, alternative: the innocent person may stand trial, and the worker may pursue a claim under the ADEA. Arnold could have litigated but chose to settle instead. If people in Arnold's position can't assure their antagonists that a settlement will bring peace, then there will be many fewer settlements, and those that still occur will be concluded on altered terms. Randall would not have paid $17 million had he thought that Arnold remained free to carry on their disputes--to drag Randall through the courts forever.

The agreement between Randall and Arnold contains a global settlement and release. Our conclusion that the agreement is valid means that the agreement extinguishes all of Arnold's claims, under both state and federal law.

Affirmed


ROVNER, Circuit Judge, concurring.  I join in the majority opinion, and agree that under the facts of this case, the non-reliance clause precludes damages for the prior oral statements. I write separately only to explain further the basis for, and scope of, that holding. As the majority opinion notes, our holding follows that of the courts of appeals in Jackvony v. RIHT Financial Corp., 873 F.2d 411 (1st Cir. 1989) (Breyer, J.) and One-O-One Enterprises, Inc. v. Caruso, 848 F.2d 1283 (D.C. Cir. 1988) (R.B. Ginsburg, J.). The reasoning in those cases, as well as other cases in this court, reveals that all circumstances surrounding the transaction are relevant in determining whether reliance on prior oral statements can be deemed reasonable. Thus, although it may be determinative in many--and perhaps most--cases, the existence of a non-reliance clause will not automatically preclude damages for prior oral statements.

In Jackvony, the First Circuit set forth eight factors that are relevant in determining whether an investor's reliance on prior statements was reasonable: (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations. 873 F.2d at 416. The court then held that the reliance on the prior statements in Jackvony was unreasonable because the prior statements were vague, Jackvony was a sophisticated investor, the written proxy statement instructed Jackvony not to rely on any other statements, Jackvony seemed anxious to expedite the transaction, and Jackvony helped draft the written acquisition documents. Thus, the Jackvony court did not hold that a non-reliance statement precludes a fraud claim in all cases, but notes that it is a factor that may defeat a claim of

reliance.

Similarly, the D.C. Circuit in One-O-One, in holding that an integration clause rendered reliance on prior representations unreasonable, set forth the context in which that written agreement was reached. Specifically, the court noted that the parties reached the written agreement after eight months of vigorous negotiations involving many offers, promises and representations, and that the integration clause was included to avoid misunderstandings as to what was agreed upon in the course of those extensive negotiations. 848 F.2d at 1286. The court also rejected the plaintiffs' claim of fraud in the inducement based on the circumstances present in that particular case, holding that "[w]e have here the case of 'a party with the capacity and opportunity to read a written contract, who [has] execute[d] it, not under any emergency, and whose signature was not obtained by trick or artifice;' such a party, if the parol evidence rule is to retain vitality, 'cannot later claim fraud in the inducement.'" Id. at 1287, quoting Management Assistance, Inc. v. Computer Dimensions, Inc., 546 F. Supp. 666, 671-72 (N.D. Ga. 1982 ___, aff'd mem. sub nom. Computer Dimensions, Inc. v. Basic Four, 747 F.2d 708 (11th Cir. 1984). In fact, in Whelan v. Abell, 48 F.3d 1247, 1258 (D.C. Cir. 1995), the court explicitly recognized that the conclusion in One-O-One "was plainly not intended to say that an integration clause bars fraud-in-the-inducement claims generally or confines them to claims of fraud in execution. . . . Such a reading would leave swindlers free to extinguish their victims' remedies simply by sticking in a bit of boilerplate." Id.

Thus, both Jackvony and One-O-One recognize that courts must consider all of the surrounding circumstances in determining whether reliance on a prior oral settlement is reasonable, and that the existence of a non-reliance clause is but one factor, albeit a fairly convincing one in many cases. This is also consistent with our decision in Carr v. CIGNA Securities, Inc., 95 F.3d 544, 547 (7th Cir. 1996), which held that "[i]f a literate, competent adult is given a document that in readable and comprehensible prose says X . . . and the person who hands it to him tells him, orally, not X . . . our literate competent adult cannot maintain an action for fraud against the issuer of the document." In discussing disclaimers in the context of a fiduciary relationship, Carr noted that a written disclaimer may not provide a safe harbor in every case, because "[n]ot all principals of fiduciaries are competent adults; not all disclaimers are clear; and the relationship involved may involve such a degree of trust invited by and reasonably reposed in the fiduciary as to dispel any duty of self-protection by the principal." Id. at 548. The reasonableness of the reliance thus depends on an analysis of the surrounding circumstances. Just as it would be unreasonable to expect a person to pore through a 427 page document looking for "nuggets of intelligible warnings," a person may not claim reasonable reliance when a written disclaimer is apparent in an eight page document. Id.

This is nothing new. The issue of reasonable reliance has always depended upon an analysis of all relevant circumstances. I write separately merely to avoid the inevitable quotes in future briefs characterizing our holding as an automatic rule precluding any damages for fraud based on prior oral statements when a non-reliance clause is included in a written agreement. The world

is not that simple, and our holding today cannot be interpreted so simplistically. On the facts in this case, involving extensive negotiations aided by counsel and with numerous rejections of efforts to include the oral representations in the written agreement, the non-reliance clause rendered any reliance on the prior statements unreasonable.