Ronald R. TIRAPELLI and Michael Webb, Plaintiffs,

v.

ADVANCED EQUITIES, INC., Lee Witkowski, Jack Pressman, Communications Infrastructure Development Corporation, WD Holdings Corp., Optimalpath Digital Network, Inc., Convergency Centers, Corporation, and Telecom Capital Group, Inc., Defendants.

No. 01 C 3342.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 15, 2002.

Arthur F. Radke, Dykema Gossett, PLIC, Chicago, IL, Gerald Berton Mullin, Gerald B. Mullin, P.C., Chicago, IL, for plaintiffs, Ronald R. Tirapelli and Michael Webb.

Michael D. Freeborn, Douglas Allan Albritton, Freeborn & Peters, Chicago, IL, Stephen Joseph Roeder, Hedlund & Hanley, LLC, Chicago, IL, for defendants, Lee Wiskowski, Communications Infrastructure Development Corporation, and Telecom Capital Group.

Elizabeth Hubbard, John C. O'Connor, Hubbard & O'Connor, Ltd., Chicago, IL, for defendants, Jack Pressman and Optimalpath Digital Network, Inc.

Joseph E. Tighe, Joseph E. Tighe, P.C., Chicago, IL, for defendant, Advanced Equities, Inc.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Before the court are (1) defendants' motions *in limine* and (2) defendants' motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c). For the following reasons, the court: (1) grants in part and denies in part defendants' motions *in limine* and (2) grants in part and denies in part defendants' motion for summary judgment as follows. The court grants defendants' motion for summary judgment on Count I of plaintiffs' complaint. On its own motion, the court dismisses Counts II and III of plaintiffs' complaint without prejudice. The court denies as moot defendants' motion for summary judgment on Counts II and III of plaintiffs' complaint.

## I. BACKGROUND[1]

Plaintiffs Ronald R. Tirapelli ("Tirapelli") and Michael Webb ("Webb") (collectively, "plaintiffs") bring this suit, claiming that defendants are liable for federal securities law violations, Illinois securities law violations, and Illinois common law fraud. Particularly, plaintiffs claim that defendants made false representations of material fact in order to induce plaintiffs to invest in defendant Telecom Capital Group, L.L.C. ("TCG").[2] In order to understand the court's opinion, one must be aware of a number of facts. For the sake of clarity, a recitation of these facts is in four parts. Part A describes TCG and its retention of defendant Advanced Equities, Inc. ("Advanced Equities") to obtain investors in TCG. Part B discusses the meetings between plaintiffs and defendants, as well as plaintiffs' decision to invest in TCG. Part C outlines the relevant provisions of the documents that plaintiffs signed before investing in TCG. Part D discusses the current lawsuit.

### A. *TCG and the Sale of Membership Interests*

TCG was formed on February 29, 2000 and was a limited liability company whose

---

1. Unless otherwise indicated, the following facts—taken from the parties' Local Rule 56.1 statements are undisputed.

2. Defendants point out that plaintiffs incorrectly named Telecom Capital Group, L.L.C. as Telecom Capital Group, Inc., and misspelled Wiskowski's name "Witkowski" in the complaint. The court will refer to these two defendants using defendants' versions of their names.

principal place of business was Chicago, Illinois.[3] Defendant Lee Wiskowski ("Wiskowski") served as president of TCG. TCG was formed primarily to invest in and make loans to companies engaged in the telecommunications, internet, or information technology businesses. The plan for TCG was to purchase buildings and remodel them as "incubators" and "carrier hotels" for start-up companies.[4] In order to raise capital, TCG retained defendant Advanced Equities to sell Preferred Membership Interests in TCG as part of a private placement. Ronald Stuppy ("Stuppy") was one of the Advanced Equities brokers who solicited investments in TCG.

## B. *The Meetings and Plaintiffs' Decision to Invest in TCG*

In early 2000, Stuppy told Tirapelli—who had previously made two investments through Stuppy—about the opportunity to invest in TCG. Stuppy explained the concept of TCG to Tirapelli and suggested that Tirapelli come to Chicago to talk to other people involved in the company. Soon thereafter, Tirapelli traveled to Chicago to attend a meeting regarding TCG at Advanced Equities's offices.

Tirapelli, Stuppy, Wiskowski and defendant Jack Pressman ("Pressman") attended this meeting. Tirapelli made an audio recording of this meeting.[5] At this meeting, Wiskowski made a presentation about TCG and explained what it intended to do with the money that it hoped to raise through the sale of the membership interests. Wiskowski explained TCG's plan to purchase buildings to be used as incubators and carrier hotels. After the meeting, Tirapelli, Stuppy, Wiskowski, and Pressman toured a building at 2233 South Throop Street in Chicago (the "Throop Property") that TCG was going to use for its business.

After Tirapelli returned home, he called his close friend Webb. During this telephone call, Tirapelli told Webb that he thought he had found a good investment for them. The two arranged to meet at Webb's office to discuss the opportunity to invest in TCG. During that meeting, Tirapelli played the tape that he had recorded at the first meeting. After playing the tape and discussing the opportunity with Webb, Tirapelli arranged for another meeting regarding TCG at Advanced Equities's offices in Chicago.

**3.** On or about June 26, 2000, TCG's management effected a corporate conversion of the company—converting the company from a limited liability company to a corporation—in order to allow institutions that could not invest in limited liability companies to invest in TCG. As a result, defendant Communications Infrastructure Development Corporation ("CIDC") was established. Parties who had invested in TCG, including Webb and Tirapelli were given shares in CIDC.

**4.** Based upon TCG's plan, an "incubator" would be office space and telecommunications services provided by TCG to start-up companies in exchange for stock in those companies. The start-up companies would grow within the incubators and then move out of the building into their own buildings. TCG hoped to earn a return on its investment through the increase in the value of the start-up companies' stock. A "carrier hotel" would be building space leased by TCG to telecommunications companies, who would locate electronics and switching equipment in the space. (Defs.' Ex. 8 at 2.)

**5.** All parties present consented to Tirapelli recording the meeting. At some point during the meeting, however, the tape recorder stopped recording. Consequently, the entire meeting was not recorded. A transcript of the recording has been produced by the parties, and they do not disagree about the relevant portion of the transcript which is included in defendants' appendix as Exhibit 8. Plaintiffs do not dispute the portions of the transcript that defendants cite in support of their motion for summary judgment.

In March 2000, Tirapelli and Webb met with Wiskowski, Pressman, and Stuppy at Advanced Equities's offices in Chicago. Wiskowski and Pressman gave a presentation about TCG during this meeting. After the presentation, Webb and Tirapelli each decided to invest $250,000.00 in TCG.

### C. *The Subscription Documents*

TCG required each plaintiff to review and sign a set of documents (the "Subscription Documents") before investing.[6] The documents explained the terms of the investment and included a questionnaire that required each potential investor to demonstrate that he satisfied the requirements for participation in the investment. Tirapelli and Webb each signed their Subscription Documents before investing in TCG.

The Subscription Documents contained a non-reliance clause, which provided:

> [I]n evaluating the suitability of an investment by the undersigned in the Company, the undersigned has relied solely upon the materials made available to the undersigned at the undersigned's request and independent investigations made by the undersigned in making the decision to purchase the Preferred Membership Interests subscribed for herein, and acknowledges that no representations or warranties (oral or written), have been made to the undersigned with respect thereto.

(the "Non–Reliance Clause") (Defs.' Ex. 9 & 10 at 5–6.) Thus, in signing the Subscription Documents, Tirapelli and Webb represented that they each had relied only on the terms of the Subscription Documents and the accompanying documents in deciding to invest in TCG, and that they had not relied upon any other representation.

The Subscription Documents explained that plaintiffs' investments in TCG "were subject to the terms and conditions contained herein." (Defs.' Ex. 9 & 10 at 1.) The documents provided in capital letters that: "IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING." (*Id.*) Additionally, the Subscription Documents explained how TCG planned to use the money from the investments. According to the agreement:

> [TCG] is offering up to 100 Preferred Membership Interests. [TCG] has been formed to invest in one or more telecommunications, internet, information technology or other technology based companies.... In addition, [TCG] anticipates that it will invest in a limited liability company or other entity *which will hold the real estate and improvements located at 2233 S. Throop, Chicago, Illinois and consisting of a 700,000 square foot office building (the "Commonwealth Edison Property"). The Commonwealth Edison Property is currently under contract to Jack Pressman or an affiliate.* [TCG] will also purchase up to 2,500,000 Series A Preferred Shares ... of OptimalPATH Digital Network, Inc., a Delaware corporation ... to be issued at $2.40 per Share. [TCG] reserves the right to reject any subscription in whole or in part for any reason in its sole discretion.

(Defs.' Ex. 9 & 10 at 1–2.) (emphasis added). Similarly, a section of the Subscription Documents entitled, "Information Regarding Investment Consider-

---

**6.** Defendants submit a set of Subscription Documents signed by each plaintiff as Exhibits 9 and 10. The Subscription Documents consist of: (1) two pages of general information and instructions; (2) the Subscription Agreement; and (3) a Purchaser Questionnaire.

ations," describes TCG's investment in real estate:

> As part of the overall negotiations with [OptimalPath Digital Network], [TCG] will acquire limited liability company membership interests in a separate limited liability company *to be formed to acquire the Commonwealth Edison Property (the "Real Estate LLC") The Commonwealth Edison Property is currently the subject of a purchase agreement in favor of Jack Pressman or an affiliate.* Pressman or his affiliate will assign their respective rights in the purchase agreement to the Real Estate LLC.

(Defs.' Ex. 9 & 10 at 10.) (emphasis added).

Finally, the Subscription Documents contains an integration clause, which stated: "The Subscription Documents constitute the entire agreement among the parties hereto with respect to the subject matter hereof and may be amended only by a written execution of all parties" (the "Integration Clause"). (Defs.' Ex. 9 & 10 at 14.)

### D. *The Current Lawsuit*

On May 3, 2001, Webb tendered his shares of CIDC to Advanced and asked that his investment transaction be rescinded. On May 4, 2001, Tirapelli did the same. Plaintiffs allege that they did this upon learning that some representations made by defendants to plaintiffs regarding TCG were false. Defendants refused to rescind the transaction or to return plaintiffs' money. Consequently, plaintiffs have filed a three-count complaint. Count I of plaintiffs' complaint asserts a claim for violation of section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)"), and Rule 10b–5

of the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5 ("Rule 10b–5"). Count II asserts a claim for violation of section 5/12 of the Illinois Securities Law of 1953, 815 ILL.COMP.STAT. 5/12 (the "Illinois Securities Law"). Count III asserts a fraud claim under Illinois common law. All three counts of plaintiffs' complaint allege that the following four statements were misrepresentations made by defendants and provide the basis for plaintiffs' claims: (1) TCG owned and had purchased the Throop Property for eight million dollars; (2) TCG had leased 350,000 square feet of the upper floors of the Throop Property to a national hotel management company for use as incubator hotel space; (3) TCG had completed all design work and entered construction contracts to complete the construction of 350,000 square feet of incubator space for high tech start-up companies; and (4) the preferred membership units in TCG were almost fully subscribed, and plaintiffs would lose the investment opportunity unless they invested immediately.[7]

The court has subject matter jurisdiction over plaintiffs' federal securities law claim in Count I pursuant to 28 U.S.C. § 1331 because that claim arises under federal law. The court has supplemental jurisdiction over plaintiffs' state law claims in Counts II and III pursuant to 28 U.S.C. § 1367(a). Before the court are (1) defendants' motions *in limine* and (2) defendants' motion for summary judgment on all counts of plaintiffs' complaint.

## II. *DISCUSSION*

### A. *Motions in Limine*

As a threshold matter, the court will dispose of defendants' motions *in limine*.

---

**7.** In their memorandum of law in opposition to defendants' motion for summary judgment, plaintiffs withdrew their allegation that defendants had misrepresented to them that a public offering of TCG stock would be made by June 2000. (Mem. in Opp'n of Defs.' Mot. for Summ.J. at 2.)

Defendants seek the following: (1) exclusion of evidence relating to alleged fraudulent or wrongful conduct not pleaded in the complaint and (2) an order barring plaintiffs from attempting to recover punitive damages on their Illinois common law fraud claim. The court will address each motion in turn.

### 1. *Fraudulent conduct not pleaded in the complaint*

Defendants seek an order barring plaintiffs from introducing evidence relating to fraudulent or wrongful conduct by the defendants that is not pleaded in this complaint. Defendants argue that the court should exclude such evidence as irrelevant to plaintiffs' properly-pleaded claims and because Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") requires allegations of fraud to be pleaded with particularity. FED.R.CIV.P. 9(b). Defendants, however, do not specify any particular evidence that they seek to exclude. Plaintiffs have not responded to defendants' motion and, therefore, the court will treat defendants' motion as agreed. Therefore, the court grants defendants' motion to the extent that evidence of fraudulent conduct that is wholly unrelated to the alleged fraudulent statements that plaintiffs have properly pleaded in their complaint shall be excluded.

### 2. *Punitive damages*

Defendants seek to prevent plaintiffs from seeking punitive damages on their Illinois common law fraud claim. However, as explained *infra* Sect. II.D, defendants' common law fraud claim is dismissed without prejudice. Therefore, defendants' motion *in limine* is denied as moot.

### B. *Summary Judgment Standard*

Summary judgment is appropriate only where "pleadings, depositions, answers to interrogatories, and admissions on file, to-gether with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *see Funeral Fin. Sys. v. United States,* 234 F.3d 1015, 1017 (7th Cir.2000) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). A genuine issue of material fact exists when, viewing the record and drawing all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Smith v. Severn,* 129 F.3d 419, 425 (7th Cir.1997).

The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548 (noting also that "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."). Once the moving party makes a *prima facie* showing that it is entitled to judgment as a matter of law, the non-moving party must set forth specific facts showing that a genuine issue for trial exists. *Id.* at 324, 106 S.Ct. 2548; *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir.1989). The non-moving party cannot rest on the pleadings alone, but must designate *specific facts* in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. *Selan v. Kiley,* 969 F.2d 560, 564 (7th Cir.1992). The non-moving party " 'must do more than simply show that there is some metaphysical doubt as to the material facts.' " *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position

will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

Defendants argue that they are entitled to summary judgment in this case because plaintiffs cannot establish a *prima facie* case for any of their claims.

## C. *Plaintiffs' Federal Securities Law Claim*

██ Section 10(b) prohibits the use of a manipulative or speculative device in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b). SEC Rule 10b–5, promulgated under Section 10(b) states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. 240.10b–5. In order to succeed on a Rule 10b–5 claim, a plaintiff must prove that the defendant: (1) made a misstatement or omission; (2) of material fact; (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which the plaintiff relied; and (6) that reliance proximately caused the plaintiff's injuries. *In re HealthCare Compare Corp. Sec. Litig.,* 75 F.3d 276, 280 (7th Cir.1996). The plaintiff must establish that his reli-

ance upon the defendants' representations was reasonable. *Harrison v. Dean Witter Reynolds, Inc.,* 79 F.3d 609, 618 (7th Cir. 1996). Defendants argue that plaintiffs cannot satisfy elements one, three, five, and six of their Rule 10b–5 claim. First, the court will determine whether plaintiffs' reliance upon defendants' alleged misrepresentations was reasonable. As discussed below, even assuming that defendants did, with scienter, make misrepresentations of material fact to plaintiffs that proximately caused plaintiffs' injuries, plaintiffs cannot establish a *prima facie* case because they cannot establish that their reliance upon those alleged misrepresentations was reasonable.

Defendants point out that the alleged representations do not appear in the Subscription Documents and argue that they are entitled to summary judgment because, due to the Non–Reliance Clause and the Integration Clause, plaintiffs could not, as a matter of law, have reasonably relied upon representations that did not appear in the Subscription Documents. Plaintiffs make three arguments in response: (1) reasonable reliance is a question of fact that is inappropriate for determination by summary judgment; (2) nothing in the Subscription Documents contradicts the alleged misrepresentations, and, therefore, their reliance upon the alleged misrepresentations was reasonable; and (3) the Non–Reliance Clause applies only to their evaluation of the suitability of the investment and that, therefore, the clause does not apply to defendants' alleged misrepresentations to plaintiffs.

Although reasonable reliance is normally a question of fact, a court can determine the issue as a matter of law "when no trier of fact could find that it was reasonable to rely on the alleged statements." *Cozzi Iron & Metal v. U.S. Office Equip.,* 250 F.3d 570, 574 (7th Cir.2001). When determining whether a party's reliance was jus-

tified, the court must consider all of the facts that the party knew, in addition to those facts that the party could have discovered through ordinary prudence. *Id.* In *Cozzi*, the Seventh Circuit pointed out that the written agreement contained a non-reliance clause and that, by signing the agreement, the plaintiff stated that it "had not relied on any oral representations contrary to the written terms of the agreement." *Id.* at 575. In that case, the court noted that plaintiff, a sophisticated business, had an opportunity to review the written agreement—particularly the terms that were explicitly different from the alleged oral representations—and that the agreement was silent on one of the issues addressed by another alleged oral representation. Finally, the court of appeals concluded that the plaintiff's reliance upon the defendant's alleged representations was not reasonable, as a matter of law. *Id.*

In *Rissman v. Rissman*, the Seventh Circuit dealt with the issue of reasonable reliance in the context of a Rule 10b-5 claim, and held that a seller of securities could not reasonably rely upon prior oral statements by the buyer when the stock purchase agreement included a non-reliance clause. 213 F.3d 381, 383-84 (7th Cir.2000). *Id.* In *Rissman*, the parties' written agreement included a non-reliance clause, which stated:

> 'The parties further declare that they have not relied upon any representation of any party hereby released [Randall] or of their attorneys ... agents, or other representatives concerning the nature or extent of their respective injuries or damages.'

213 F.3d at 383. In that case, Arnold Rissman sold his shares of stock in a family-owned business to his brother, Randall, after Randall verbally warranted that he was not planning to sell the company. The written stock purchase agreement did not include any such warranty. Randall subsequently sold all the stock. Arnold sued Randall, claiming that Randall's statements that he was not planning to sell the company were fraudulent statements that violated Rule 10b-5. Additionally, by signing the written agreement, Arnold warranted to Randall that (a) "no promise or inducement for this Agreement has been made to him except as set forth herein;" and (b) "this Agreement is executed by [Arnold] ... without reliance upon any statement or representation by [Randall]." *Id.* The Seventh Circuit noted that a non-reliance clause "ensures that both the transaction and any subsequent litigation proceed on the basis of the parties' writings, which are less subject to the vagaries of memory and the risks of fabrication." *Id.* at 384. The court concluded that "a written anti-reliance clause precludes any claim of deceit by prior representations." *Id.*

In the instant case, plaintiffs warranted—in the Non-Reliance Clause—that they had relied upon only the materials made available to them, at their request, and upon their independent investigations. (Defs.' Ex. 9 & 10 at 5-6.) Additionally, plaintiffs acknowledged that no representations or warranties had been made to them with respect to their evaluation of the investment and their decision to purchase the membership interests. (*Id.*) Finally, the Integration Clause contained in the Subscription Documents stated that the Subscription Documents constituted the entire agreement between plaintiffs and defendants. Therefore, the court concludes that *Cozzi* and *Rissman* are applicable to its analysis in this case.[8] First,

---

**8.** The court is unpersuaded by plaintiffs use of two cases that distinguish *Rissman*. In *Vigortone AG Products, Inc. v. PM AG Products,* *Inc.*, which involved a claim for common law fraud under Illinois law, the written agreement did not contain an non-reliance clause.

the court will apply *Cozzi* and *Rissman* to defendants' alleged misrepresentations as to which the Subscription Documents are silent. Second, the court will apply those cases to defendants' alleged misrepresentations that are expressly contradicted by the Subscription Documents.

First, the Subscription Documents are silent on the issues of a lease agreement involving the Throop Property, design work or construction contracts on the Throop Property, or the limited availability of TCG membership interests. This is precisely the situation involved in *Rissman*. Therefore, the court follows *Rissman* and concludes that plaintiffs cannot establish reasonable reliance in this case. 213 F.3d at 383–84. *See also Donovan v. ABC–NACO, Inc.*, Nos. 02 C 1951, 2002 WL 1553259, at *6 (N.D.Ill. July 15, 2002) (finding that plaintiff could not prove reasonable reliance because a written agreement containing an integration clause that was silent on points upon which there had been prior verbal representations must be deemed to abandon those earlier representations).

◼ Second, the Subscription Documents expressly contradict defendants' alleged misrepresentations that TCG owned the Throop Property. The Subscription Documents expressly state in two different places that the Throop Property was currently under contract to Pressman and that TCG would invest in a separate limited liability company that would be formed to acquire the property. (Defs.' Ex. 9 & 10 at 2, 10.) In contrast, the documents make no statement that TCG currently owned the Throop Property. The Seventh Circuit in *Rissman* referred to the princi-

ple that "a person who has received written disclosure of the truth may not claim to rely on contrary oral falsehoods." 213 F.3d at 384. *Rissman* dealt with representations by the defendant that were neither included nor expressly contradicted by the written agreement. In this case, where the written agreement expressly contradicts the alleged oral representations, the court concludes as a matter of law that plaintiffs cannot establish that they reasonably relied upon defendants' alleged statements that TCG owned the Throop Property.

Furthermore, plaintiffs are businessmen with significant wealth and multiple investments who entered into a written agreement that expressly stated that it contained all relevant information as to the investment and contained ample cautionary language. Plaintiffs had every opportunity to read the agreement and compare their understanding of any oral representations regarding the investment with the written provisions. Plaintiffs ultimately signed the Subscription Documents, and in so doing represented that they had relied upon only the document in making their decision. *See Cozzi*, 250 F.3d at 575 (reviewing all the circumstances of the transaction, including the sophistication of the parties, their opportunity to review the documents, and the clarity of the language, in determining whether plaintiff's reliance was reasonable). *See also Am. Bankcard, Int'l, Inc. v. Schlumberger Tech., Inc.*, No. 99 C 6434, 2001 WL 1465760, at *3 (N.D.Ill. Nov. 14, 2001) (granting summary judgment after reviewing the circumstances of the transaction, and noting that a non-reliance clause will be determinative

No. 99 C 7049, 2001 WL 19462342001 U.S.Dist. LEXIS 2870, at *5–6 (N.D.Ill. Mar. 12, 2001) Additionally, in *Larson v. Burlington N. & Santa Fe Ry. Co.*, the District of Minnesota distinguished *Rissman* because *Larson* was a case brought under the Federal

Employers Liability Act. No. 01–527 (RHK/RLE), 2002 WL 47005, at *14 (D.Minn. Jan. 10, 2002). Because the instant case involves a non-reliance clause and is not brought under the FELA, the court is unpersuaded by plaintiffs' use of these cases.

in most cases) (citing *Rissman,* 213 F.3d at 387–89 (Rovner, J. concurring)). Therefore, the court cannot conclude that plaintiffs reasonably relied upon defendants' alleged oral statements regarding a lease agreement involving the Throop Property, design work or construction contracts on the Throop Property, or the limited availability of TCG membership interests.

Plaintiffs argue that the Non–Reliance Clause applies only to their evaluation of the suitability of the investment in TCG and that, therefore, the clause does not make their reliance upon defendants' alleged oral representations unreasonable. In support of their argument, plaintiffs cite two Second Circuit cases that plaintiffs argue explain federal securities fraud claims as to suitability. Neither of plaintiffs' cases, however, support their argument. Furthermore, the court's own research has not uncovered any authority that would support plaintiffs' position. Therefore, the court is unpersuaded by plaintiffs' arguments.

The court concludes that no reasonable fact finder could conclude that plaintiffs' reliance upon defendants' alleged misrepresentation was reasonable. Consequently, plaintiffs cannot prove a *prima facie* case for securities fraud under Rule 10b–5. The court need not address the other elements of plaintiffs' case. Accordingly, the court grants defendants summary judgment on plaintiffs' federal securities law claims.

**D. *Plaintiffs' State Law Claims***

█ Still pending before the court are: (1) Count II, a claim for violation of the Illinois Securities Law; and (2) Count III, a fraud claim, based upon Illinois common law. The court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

Although § 1367(a) *authorizes* federal courts to exercise supplemental jurisdic-

tion over state law claims, this does not mean that federal courts *must* exercise jurisdiction in all cases. *City of Chicago v. Int'l Coll. of Surgeons,* 522 U.S. 156, 172, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997). Rather, supplemental jurisdiction is "a doctrine of discretion, not of plaintiff's right. . . ." *Id.* Although there are "unusual cases in which the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness and comity—will point to federal decision of the state-law claims on the merits," the district judge is given broad power in determining whether such circumstances apply and, thus, whether it is appropriate to retain jurisdiction over the state law claims. *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 727–28 (7th Cir.1998). The district court's discretion to relinquish supplemental jurisdiction is "almost unreviewable," especially when all federal claims have been dropped from the case before trial and only state law claims remain. *Id.* "At that point, respect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law, become paramount concerns." *Id.* In fact, "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.* 193 F.3d 496, 501 (7th Cir.1999).

In this case, the only claim giving rise to federal jurisdiction in the first instance was plaintiffs' claim under the federal securities laws, and the court granted summary judgment on this claim, *supra* Sect. II.C.. Because the court granted summary judgment on plaintiffs' only federal claim, federal jurisdiction over the remaining counts is based entirely upon the supplemental jurisdiction statute. That statute provides that a district court "may

decline to exercise supplemental jurisdiction" over supplemental state law claims if the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). Therefore, it is within this court's discretion to proceed with plaintiffs' state law claims or dismiss them. In this case, the court finds that the factors of judicial economy, convenience, fairness and comity are not served by this court's retention of jurisdiction. *See Int'l Coll. of Surgeons,* 522 U.S. at 172, 118 S.Ct. 523 (outlining factors).

First, judicial economy is not served by this court's retention of jurisdiction. At this point, the burden of the state law claims would be the same for a federal as for a state court, and there would be no substantial duplication of effort if the state law claims were tried in state court. *See Wright v. Associated Ins. Cos. Inc.,* 29 F.3d 1244, 1251 (7th Cir.1994) (holding that the district court should have relinquished jurisdiction over state law claims when the federal claims were dismissed and there was very little federal judicial investment in the state law claims).

Second, convenience is not served by this court's retention of jurisdiction. The state law claims are not patently frivolous, nor is it absolutely clear to this court how the supplemental state law claims will be decided. *See Van Harken v. City of Chicago,* 103 F.3d 1346, 1354 (7th Cir.1997) (reaffirming the "no brainer" exception to the general rule that federal courts should relinquish jurisdiction of state law claims); *Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1182 (7th Cir.1993) (holding that retention of a state law claim is appropriate when the correct disposition of the claim is "so clear as a matter of state law that it could be determined without further trial proceedings and without entanglement with any difficult issues of state law . . . .").

Finally, fairness and comity are not served by this court's retention of jurisdiction. Under § 1367(d), the period of limitations for any claim asserted under subsection (a) "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d). Thus, dismissal of the state law claims on jurisdictional grounds will not preclude plaintiffs from pursuing this matter in state court. *Olde Disc., Inc. v. Parker,* No. 97 C 5746, 1998 WL 901673, at *4 (N.D.Ill.Dec. 21, 1998). Further, no res judicata effect attaches to the claims the court dismisses for lack of subject matter jurisdiction. *Follkie v. City of Chicago,* No. 97 C 154, 1997 WL 527304, at *6 n. 7 (N.D.Ill. Aug. 19, 1997).

In sum, judicial economy, convenience, fairness and comity do not compel this court to retain jurisdiction over plaintiffs' state law claims. This case belongs in state court. Therefore, this court exercises its discretion in dismissing without prejudice plaintiffs' supplemental state law claims, Counts II and III. *See Standard Bank & Trust Co. v. Vill. of Orland Hills,* 891 F.Supp. 446, 452 (N.D.Ill.1995) (dismissing federal due process claim and relinquishing jurisdiction over remaining state law claims in zoning action). Plaintiffs are free to file these claims in state court. The court denies as moot defendants' motion to dismiss Counts II and III on the merits.

### III. *CONCLUSION*

For the foregoing reasons, the court: (1) grants in part and denies in part defendants' motions *in limine* and (2) grants in part and denies in part defendants' motion for summary judgment as follows. The court grants defendants' motion for summary judgment on Count I of plaintiffs' complaint. On its own motion, the court dismisses Counts II and III of plaintiffs' complaint without prejudice. The

court denies as moot defendants' motion for summary judgment on Counts II and III of plaintiffs' complaint. As to Count I of plaintiffs' complaint, final judgment is entered in favor of defendants Advanced Equities, Inc., Lee Wiskowski, Jack Pressman, Communications Infrastructure Development Corporation, WD Holdings Corp., Optimalpath Digital Network, Inc., Convergency Centers Corporation, and Telecom Capital Group, LLC and against plaintiffs Ronald R. Tirapelli and Michael Webb.