In the

# United States Court of Appeals

### For the Seventh Circuit

No. 17-2583

KURT V. CORNIELSEN, *et al.*,

*Plaintiffs-Appellants*,

*v.*

INFINIUM CAPITAL
MANAGEMENT, LLC, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14-cv-00098 — **Andrea R. Wood**, *Judge*.

ARGUED FEBRUARY 13, 2018 — DECIDED FEBRUARY 13, 2019

Before SYKES and BARRETT, *Circuit Judges*, and GRIESBACH,
*Chief District Judge*.[*]

_____

[*] Of the Eastern District of Wisconsin, sitting by designation.

GRIESBACH, *District Judge*. Plaintiffs-appellants, 39 former
employees of Infinium Capital Management, LLC, voluntar-
ily converted loans they had made to their employer under
the company's Employee Capital Pool program into equity in
the company. A year later their redemption rights were sus-
pended, and six months after that, they were told their invest-
ments were worthless. Plaintiffs filed suit against their em-
ployer, the holding company that owned their employer, and
several members of the senior management, asserting claims
for federal securities fraud and state law claims for breach of
fiduciary duty and fraud. This appeal is from the district
court's order dismissing with prejudice their fifth amended
complaint for failure to state a claim. For the reasons that fol-
low, we affirm.

## I. Background

Infinium is a diversified alternative asset and risk manage-
ment firm with offices in Chicago, Houston, New York, and
London. It trades exchange-traded and centrally cleared fi-
nancial instruments offering fundamental arbitrage strate-
gies. Infinium Capital Holdings is a holding company that
owned Infinium. To simplify and for clarity, we refer to both
as Infinium.

Prior to 2012, Infinium created the Employee Capital Pool,
through which Plaintiffs collectively loaned the company just
over $5 million. After a profitable year in 2011, Infinium in-
vited capital pool participants to convert their loans into eq-
uity as Class B-2 shareholders in Infinium through an "Equity
Conversion" program. Capital pool participants received no-
tice of the Equity Conversion opportunity by e-mail on Feb-
ruary 14, 2012. Members of Infinium's senior management—
Charles Whitman, Gregory Eickbush, Brian Johnson, and

Scott Rose (collectively, the Individual Defendants)—subsequently conducted three "town hall" meetings about the proposal. Those meetings occurred on February 16, 17, and 22, 2012, and each Plaintiff attended at least one meeting.

Plaintiffs claim that the Individual Defendants made several misrepresentations and omissions at the three town hall meetings that induced them to participate in the Equity Conversion. Plaintiffs allege the Individual Defendants stated there would be a single class of equity in Infinium and that all current and future equity holders would receive equal treatment; whereas in fact, Infinium was seeking the infusion of new funds from third-party investors and offered those investors superior rights to all other equity holders in Infinium and guaranteed the equity of those investors from certain losses. Plaintiffs also allege the Individual Defendants stated that Infinium had access to an untapped $20 million line of credit that it could use to pay down debt owed to George Hanley and Nathan Laurell, two members of Infinium's advisory board who were in the process of redeeming their equity in Infinium. Finally, the Individual Defendants allegedly also told meeting attendees that those who participated in the Equity Conversion would receive two free months of profit for January and February 2012, when in fact, Infinium had lost $4.3 million during that period and there was no profit for those months as a result. In addition, in the course of soliciting the conversion of their loans to equity, Infinium wrote to Plaintiffs and explained that Plaintiffs would be able to redeem 50% any monies converted from debt to equity or otherwise invested by Plaintiffs in the first year (2013) and 50% in the following year (2014), with the ability to withdraw all of their equity investments in just two years.

Participants in the capital pool also received a Private Placement Memorandum (PPM) on February 14, 2012, detailing the risks of the Equity Conversion. The PPM made extensive disclosures about the risks to Plaintiffs' investments and the nature of the interests in Infinium they would obtain if they chose to participate in the Equity Conversion. It disclosed that Equity Conversion participants would "not have voting rights," meaning their interests would not permit them "to elect or remove members of the Board" and they would not "have any ability to affect the management of the company." The PPM also contradicted certain statements Plaintiffs allege the Individual Defendants made during the town hall meetings. For instance, with regard to Infinium's debts, the PPM disclosed that Plaintiffs' equity interests would be "junior in right of payment" to Infinium's "secured and unsecured debts, including commercial lines of credit" and "any other debt securities [Infinium] may issue in the future." The disclosures were particularly forthright about risks from a $53 million debt related to the redemption of equity interests in Infinium held by George Hanley and Nathan Laurell: "This will cause a significant change in the capital structure of Infinium, and could constrain or even eliminate Infinium's ability to obtain financing for its business pursuits. The servicing of this debt will constrain Infinium's available capital and could have a material adverse effect on Infinium's business."

Also disclosed in the PPM were limitations on the participants' redemption of capital, only 50% of which would be available for redemption after one year, with the remainder available after a second. The PPM explicitly stated that those redemption rights could be limited or suspended by the board under certain circumstances, such as if redemption

would prevent the company from complying with regulations requiring it to hold a particular amount of capital. In addition, the company would have "broad discretion in using the proceeds" from the Equity Conversion and, indeed, might "not use them in a manner Investors would prefer."

The PPM also referred to the LLC Agreement for Infinium as well as a Subscription Agreement, both of which were attached as exhibits. The LLC Agreement provided details about the structure of Infinium, including information described in the PPM, such as capital redemption rules and the nature of participants' equity interests. The Subscription Agreement set forth several representations and warranties, including that the Equity Conversion participant could "bear the economic risk of losing the … entire investment." The Agreement confirmed that each Equity Conversion participant was furnished with the LLC Agreement, the Joinder, the PPM, and other documents, materials, and information as he or she deemed necessary for evaluating whether to invest in the company. The Subscription Agreement also contained a non-reliance clause which stated: "[I]n entering into this transaction the undersigned is not relying upon any information other than that contained in the LLC Agreement, the Joinder and the results of the undersigned's own independent investigation." All Equity Conversion participants were required to sign the Subscription Agreement.

Plaintiffs allege they were told that, if they did not elect to participate in the Equity Conversion by March 2, 2012, then their loans would be repaid during 2012. Thereafter, Plaintiffs allege, those who opted against taking part in the Equity Conversion would no longer be able to participate in a permanent, structured vehicle to share in the company's growth. Prior to

the March 2nd deadline, Plaintiffs allege that the Individual Defendants represented to some Plaintiffs that Infinium would still have nearly $50 million in equity after Hanley and Laurell redeemed their own equity interests. Ultimately, every Plaintiff elected to participate in the Equity Conversion and, collectively, converted more than $5 million from capital pool loans into equity in Infinium. Some Plaintiffs chose to invest additional funds in excess of loans already made through the capital pool.

According to Plaintiffs, Infinium's financial position was far worse than represented to them when they agreed to participate in the Equity Conversion. During an April 2015 deposition conducted by the Securities and Exchange Commission (SEC), Plaintiff Gordon Wallace allegedly saw certain confidential documents authored or received by the Individual Defendants pertaining to Infinium's financial situation in the weeks before the Equity Conversion. According to Plaintiffs, the documents showed that Infinium was insolvent and on the verge of bankruptcy at that time and had already drawn down $6 million on the $20 million line of credit mentioned at the town hall meetings. Infinium's management team thus feared that its lender would require immediate repayment of the line of credit, an impossibility due to the company's insolvency. Moreover, Plaintiffs allege that the documents showed that Infinium had already incurred losses of $4.3 million during January and February 2012. The documents also allegedly demonstrated that, before the Equity Conversion, Infinium lacked the resources to repay the capital pool loans, to allow Hanley and Laurell to redeem their equity, or even to sustain the trading activities necessary to generate profits. As further indication of Infinium's poor financial circumstances during early 2012, Plaintiffs allege that in

late 2011 two of the Individual Defendants, Charles Whitman and Brian Johnson, privately made undisclosed redemptions of their own equity in Infinium.

Infinium's financial difficulties continued throughout 2012, culminating in losses for the year in excess of $6.5 million. On March 8, 2013, Infinium suspended Plaintiffs' rights to redeem their capital on the ground that the company was in default of its debt service obligations to Hanley and Laurell. During an "investor call" with Plaintiffs on September 1, 2013, Infinium's acting CEO revealed that the money invested by the Equity Conversion participants had become "worthless," with a value of negative $18 million. At that time, Plaintiffs also learned that, to prevent a hostile takeover by Hanley, Infinium had not only converted a portion of the debt owed to Hanley and Laurell into equity but also agreed to eliminate Plaintiffs' right to redeem their investments. Additionally, Plaintiffs learned during the call about a class of equity consisting of money invested by third-parties that was superior to Plaintiffs' equity and protected from certain losses. Infinium sought additional outside investment during February 2013.

Plaintiffs filed this action in the Northern District of Illinois in January 2014. Their complaint alleged claims for federal securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. *See* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5. The complaint also included common law claims for fraud and breach of fiduciary duty. Essentially, Plaintiffs alleged that during the three February 2012 town hall meetings Infinium, through its management, made various misrepresentations and omissions regarding the Equity Conversion proposal and Infinium's financial condition that

had a material effect on Plaintiffs' decisions to convert their loans into equity.

Although Plaintiffs amended their complaint several times (once as a matter of right and subsequently with leave of the court), the district court granted motions dismissing the second and fourth amended complaints. Both dismissals were without prejudice. After Plaintiffs filed a fifth amended complaint, the district court issued an order in July 2017 granting yet another motion to dismiss, this time with prejudice.

In dismissing the fifth amended complaint, the district court explained that Plaintiffs' most recent amendments failed to correct deficiencies that the court had previously identified. The court noted that it dismissed the second and fourth amended complaints because Plaintiffs "insufficiently pleaded scienter, failed to identify the speakers of the alleged misrepresentations with particularity, and failed to plead a duty to speak with respect to the alleged material omissions." Yet the fifth amended complaint made no changes in the pleading of scienter, made only conclusory allegations that the defendants had a duty to speak with regard to the alleged omissions, and made only cosmetic rather than substantive changes in an attempt to identify with particularity which Individual Defendants made the alleged misrepresentations. Plaintiffs now appeal the dismissal with prejudice of the fifth amended complaint.

## II. Analysis

We review *de novo* a district court's grant of a motion to dismiss for failure to state a claim. *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017). Before addressing the arguments raised by Plaintiffs, we turn first to the argument

by Infinium and the Individual Defendants that the non-reliance clause in the Subscription Agreement requires dismissal regardless of whether the fifth amended complaint adequately stated a claim for relief.

**A. The Non-Reliance Clause**

In support of their motions to dismiss the second, fourth, and fifth amended complaints, Infinium and the Individual Defendants argued that, even if Plaintiffs stated a claim, the non-reliance clause contained in the Subscription Agreement requires dismissal. The district court did not address this argument when dismissing any of the complaints. Citing *Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000), the defendants argue that, as a matter of law, Plaintiffs' claimed reliance on oral statements made at the town hall meetings was unreasonable in light of the Subscription Agreement's non-reliance clause, through which each Plaintiff indicated he or she was not relying upon any information other than that contained in the LLC Agreement, the Joinder, and the results of his or her own independent investigation.

In *Rissman*, this court concluded that several non-reliance clauses in a private stock sale agreement prevented a plaintiff from bringing a federal securities fraud claim alleging that he sold his shares in a family company based on his brother's deceitful assurances that he would never take the company public or sell it to a third party. *Id.* at 382–83. The court held that "non-reliance clauses in written stock-purchase agreements preclude any possibility of damages under the federal securities laws for prior oral statements." *Id.* at 383–84 (first citing *Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411 (1st Cir. 1989) (Breyer, J.); then citing *One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1282 (D.C. Cir. 1988) (Ginsburg, J.)). Emphasizing that

non-reliance clauses are the product of any bargain negotiated between the parties, the court observed that they "ensure[] that both the transaction and any subsequent litigation proceed on the basis of the parties' writings, which are less subject to the vagaries of memory and the risks of fabrication." *Id.* at 384; *see also Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 992 (7th Cir. 2005) (noting that enforcement of a non-reliance clause was particularly appropriate because "the parties were sophisticated commercial entities assisted by counsel"); *Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 644–45 (7th Cir. 2002) ("[P]arties to contracts who do want to head off the possibility of a fraud suit will sometimes insert a 'no-reliance' clause into their contract, stating that neither party has relied on any representations made by the other. Since reliance is an element of fraud, the clause, if upheld—and why should it not be upheld, at least when the contract is between sophisticated commercial enterprises—precludes a fraud suit … ." (internal citations omitted)).

Each Plaintiff in this case entered into a written agreement that contained ample cautionary language about the risks associated with the investment. In particular, the Subscription Agreement recognizes that Infinium is a highly speculative venture involving a high degree of financial risk and, as a result, each Equity Conversion participant must be able to bear the economic risk of losing his or her entire investment. Each Plaintiff signed the Subscription Agreement and represented that he or she was "not relying upon any information other than that contained in the LLC Agreement, the Joinder and the results of the undersigned's own independent investigation." Plaintiffs had every opportunity to read the agreement and investigate the company as he or she deemed appropriate to evaluate the merits and risks of the investment. Based on

this court's decision in *Rissman*, the written representations in the Subscription Agreement preclude Plaintiffs from now claiming that they chose to participate in the Equity Conversion because they reasonably relied on the Individual Defendants' oral statements made during the town hall meetings. Although the district court's dismissal of the fifth amended complaint could be affirmed in large part on this basis alone, the court will address Plaintiffs' challenges to the merits of the district court's decision that the complaint failed to state a claim for relief.

**B. Failure to State a Claim for Federal Securities Fraud**

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). "To survive a Rule 12(b)(6) motion to dismiss, a complaint must (1) describe the claim in sufficient detail to give the defendant fair notice of the claim and grounds on which it rests, *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005), and (2) contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Heightened pleading requirements apply to complaints alleging fraud. Federal Rule of Civil Procedure 9(b) provides that a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." This generally means "describing the 'who, what, when, where, and how' of

the fraud." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir 2011). The purpose of this particularity requirement is "to discourage a 'sue first, ask questions later' philosophy." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011). "Greater precomplaint investigation is warranted in fraud cases," we have explained, "because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual), … because fraud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it, … and because charges of fraud (and also mistake, the other charge that Rule 9(b) requires be pleaded with particularity) frequently ask courts in effect to rewrite the parties' contract or otherwise disrupt established relationships." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999) (internal citations omitted).

To state a claim for federal securities fraud, a complaint must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (citing *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). Even before the enactment of the Private Securities Litigation Reform Act of 1995 (PSLRA), this court had held that securities fraud claims must satisfy Rule 9(b)'s particularity standard. *See Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990). Section 21D(b)(2) of the PSLRA added the requirement that complaints alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Any

complaint alleging a material misstatement or omission must also "specify each statement alleged to have been misleading" and the "reason or reasons why the statement is misleading." *Id.* § 78u-4(b)(1).

These are the standards the district court applied in finding Plaintiffs' fifth amended complaint insufficient. Plaintiffs contend that the district court erred in three respects by dismissing their complaint with prejudice. First, they maintain that they identified with adequate particularity the alleged fraudulent statements and omissions by the Individual Defendants. Second, they assert that the complaint creates a strong inference that the Individual Defendants acted with the required state of mind. Finally, they assert that the facts alleged in the complaint show that Infinium and the Individual Defendants had a duty to disclose various pieces of information to them. We will address each argument in turn.

1.  ***Plaintiffs Failed to Identify the Speakers of Alleged Misrepresentations with Adequate Particularity.***

To satisfy Rule 9(b)'s particularity standard, a complaint must "state 'the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994) (internal quotation marks omitted) (quoting *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992)). As a result, "[a] complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient." *Sears*, 912 F.2d at 893 (quoting *Design Inc. v. Synthetic Diamond Tech., Inc.*, 674 F. Supp. 1564, 1569 (N.D. Ill. 1987)).

The district court dismissed Plaintiffs' second amended complaint in part because it set forth only general allegations that "the Defendants" made various representations at the town hall meetings. Those allegations failed to establish the identity of the individuals who made the alleged representations and therefore clearly lacked Rule 9(b)'s required particularity. Likewise, the district court dismissed the fourth amended complaint because it merely replaced general allegations against "the Defendants" or "Infinium" with lists of the Individual Defendants' names—"Whitman, Eickbush, Rose, and Johnson"—and thus provided no greater detail regarding which individuals made which representations. It was against this backdrop that the district court determined that the fifth amended complaint involved a change in form rather than substance by replacing three counts against "all defendants" and "all Individual Defendants" with thirteen counts that repeated the same general allegations against each defendant individually, while at the same time conceding that they did not know which Individual Defendant said what. Plaintiffs argue, however, that the "group pleading" doctrine permits them to make collective allegations here because the Individual Defendants made three group presentations to Plaintiffs as potential investors.

Prior to enactment of the PSLRA, some circuits adopted the group pleading doctrine to "allow[] plaintiffs to link certain defendants to alleged misrepresentations simply by pleading that the defendants were part of the 'group' that likely put the challenged documents together." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 363 (5th Cir. 2004). The Ninth Circuit first formulated the doctrine in *Wool v. Tandem Computers Inc.*:

> In cases of corporate fraud where the false or mislead-
> ing information is conveyed in prospectuses, registra-
> tion statements, annual reports, press releases, or other
> "group-published information," it is reasonable to pre-
> sume that these are the collective actions of the officers.
> Under such circumstances, a plaintiff fulfills the partic-
> ularity requirement of Rule 9(b) by pleading the mis-
> representations with particularity and where possible
> the roles of the individual defendants in the misrepre-
> sentations.

818 F.2d 1433, 1440 (9th Cir. 1987) (citation omitted). Since the
enactment of the PSLRA, however, some courts have deter-
mined that the judicially-created group pleading doctrine
"cannot withstand" the PSLRA's clear statutory prerequisites
"that the untrue statements or omissions be set forth with par-
ticularity as to 'the defendant' and that scienter be pleaded
with regard to 'each fact or omission' sufficient to give 'rise to
a strong inference that the defendant acted with the required
state of mind.'" *Southland*, 365 F.3d at 364 (citing 15 U.S.C.
§ 78u-4(b)). This court has embraced that reasoning and de-
clined to permit group pleading in this context. *See Makor Is-
sues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 603 (7th Cir.
2006), *rev'd on other grounds*, 551 U.S. 308 (2007) (*Makor I*).

Plaintiffs argue that, although this court has expressly
rejected the group pleading doctrine with regard to group-
published documents, it has not gone so far as to preclude the
invocation of the group pleading doctrine to oral statements.
But nothing in the PSLRA indicates that its particularity
requirements distinguish between oral and written
statements. Indeed, extending the group pleading doctrine to
encompass oral representations would be inconsistent with

the reasoning that originally led some courts to create an exception to Rule 9(b). As the Ninth Circuit explained in *Wool*, the court deemed it reasonable to presume that information in promulgated written documents reflected "the collective actions of the officers." 818 F.2d at 1440. The doctrine sought to account for the opaque nature of modern business entities and "the fact that an individual's actual role in drafting and approving particular documents and statements cannot, in many cases, be reliably deduced from their title." *Southland*, 365 F.3d at 363 n.5. Oral statements, by contrast, involve no such ambiguity; they emanate from a single person against whom purportedly defrauded listeners can bring a claim directly. *See, e.g.*, *In re Interactive Network, Inc. Sec. Litig.*, 948 F. Supp. 917, 922–23 (N.D. Cal. 1996) ("The purpose of the doctrine is to relieve plaintiffs the burden of proving the authorship of a writing. This problem of authorship does not arise with oral statements."); *see also* William O. Fisher, *Don't Call Me a Securities Law Groupie: The Rise and Possible Demise of the "Group Pleading" Protocol in 10b-5 Cases*, 56 Bus. Law. 991, 1008 n.48 (2001) (discussing courts' refusal to apply *Wool* to oral statements). This court's determination that the group pleading doctrine is inconsistent with the PSLRA's particularity requirements thus applies with equal weight regardless of the form of the alleged misrepresentation or omission.

Here, all Plaintiffs attended at least one town hall meeting, at which they allege that they each heard oral presentations about the Equity Conversion from the Individual Defendants. Plaintiffs' claims are premised upon their reliance on the oral statements made at the town hall meetings, despite those statements being clearly contrary to the written materials Plaintiffs received, and yet, Plaintiffs have no recollection of

who said what, even though each Plaintiff personally observed which representations Whitman, Eickbush, Rose, and Johnson made on particular days. Plaintiffs concede that they cannot sufficiently plead the relationship between the particular representations made at the town hall meetings and the identity of the Individual Defendant who spoke them without taking discovery. Plaintiffs contend that they repeatedly requested that the district court allow discovery to commence in order to obtain the transcripts of the town hall meetings, but the district court denied their motions to lift the discovery stay that was put into effect pursuant to the requirements of the PSLRA.

The PSLRA imposes an automatic stay on discovery while a motion to dismiss is pending, absent exceptional circumstances. 15 U.S.C. § 78u-4(b)(3)(B). The purpose of the provision is to curtail abusive litigation—it allows the court to evaluate the plaintiffs' claims before imposing any unreasonable burden on the defendant and it prevents a plaintiff from bringing an action without first possessing the information necessary to satisfy the heightened pleading requirements of the PSLRA and using discovery to obtain that information and resuscitate a complaint that would otherwise be dismissed. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *In re Comdisco Sec. Litig.*, 166 F. Supp. 2d 1260, 1263 (N.D. Ill. 2001). Plaintiffs have not argued that the district court abused its discretion in denying its motions and have not addressed the court's reasons for so ruling. Those arguments are now waived as a result. *See Hentosh v. Herman M. Finch Univ. of Health Sci./The Chi. Med. Sch.*, 167 F.3d 1170, 1173 (7th Cir. 1999). In short, the district court reasonably determined that the fifth amended complaint's new gambit of al-

leging in separate but identical counts that all Individual Defendants made all misrepresentations or omissions lacked the particularity required by Rule 9(b) and the PSLRA.

### 2. *Plaintiffs Failed to Adequately Plead Scienter.*

As noted above, a federal securities fraud complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The "required state of mind" refers to the element of scienter, which means "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). Under the PSLRA's "strong inference" standard, "[a] complaint will survive … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. When determining whether a complaint creates a strong inference of scienter, "the court must take into account plausible opposing inferences." *Id.* at 323.

This circuit's rejection of the group pleading doctrine, discussed above, has particular relevance for the pleading of scienter in securities fraud cases. The PSLRA requires that the complaint "state with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). Agreeing with the Fifth Circuit, this court has observed that "PSLRA references to 'the defendant' may only reasonably be understood to mean 'each defendant' in multiple defendant cases." *Makor I*, 437 F.3d at 602 (quoting *Southland*, 365 F.3d at 365–66). As a result, "plaintiffs must create a strong inference

of scienter with respect to *each individual defendant*." *Pugh*, 521 F.3d at 693–94 (emphasis added) (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (*Makor II*)).

The fifth amended complaint's shortcomings in stating its claims with particularity as to each Individual Defendant carry over into its pleading of scienter. As the district court noted in dismissing both the fourth and fifth amended complaints, the allegation that the Individual Defendants acted with an intent to deceive hinged on a single paragraph detailing the information that Plaintiff Gordon Wallace allegedly obtained during his April 2015 deposition by the SEC. That paragraph alleges that attorneys for the SEC "showed him documents authored, and/or received, by Whitman, Eickbush, Rose, and Johnson" demonstrating that the Individual Defendants knew various pieces of information about Infinium's true financial situation in January and February 2012.

Nothing about that paragraph, however, associates knowledge of particular information about Infinium with any particular Individual Defendant, making it impossible to assess the statements any Individual Defendant made at the town hall meetings against the information he allegedly possessed at the time he made them. Instead, it suggests that one plaintiff saw documents indicating that one or more Individual Defendants may have possessed information that impugned the truth of the representations made at the town hall meetings. This court has determined, however, that a complaint fails to satisfy the PSLRA's particularity requirements by making conclusory allegations of scienter derived from a defendant's mere access to information. *See Pugh*, 521 F.3d at 694 ("[T]here is a big difference between knowing about … reports from [a subsidiary] and knowing that the reports are

false." (third alteration in original) (quoting *Higginbotham*, 495 F.3d at 758)).

Analogizing to *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011), Plaintiffs argue that they have pleaded ample facts to create a strong inference that the Individual Defendants acted with an intent to deceive when soliciting participation in the Equity Conversion. Specifically, they contend that during January and February 2012 the Individual Defendants all had significant equity interests in Infinium, knew that Infinium faced significant financial pressures, knew that pressure on Infinium threatened their personal investments in it, and made knowingly false statements at the three town hall meetings to secure an infusion of equity from Plaintiffs that would permit the Individual Defendants to redeem a portion of their own investments. But Infinium and the Individual Defendants counter that the complaint merely shows that, after several years of growth, Infinium presented an investment opportunity to its employees—sophisticated financial professionals—who chose to participate and then suffered the consequences of unfavorable market conditions arising shortly thereafter. Because Plaintiffs' fifth amended complaint failed to make adequately individualized allegations against each Individual Defendant, however, we need not determine whether the inference of scienter propounded by Plaintiffs is cogent and at least as compelling as the proposed alternative.

### 3.  *Plaintiffs Failed to Plead a Duty to Speak.*

As their final basis for reversal, Plaintiffs contend that the district court erred in concluding that they failed to establish that Infinium and the Individual Defendants had a duty to disclose certain information to them. Plaintiffs contend that the facts alleged support their assertion that the Individual

Defendants had a "duty to speak" regarding Infinium's financial condition.

The district court's decision dismissing the fifth amended complaint summarized Plaintiffs' efforts to plead a duty to speak. Compared to the fourth amended complaint, the fifth amended complaint added two paragraphs alleging a duty to speak:

65.  By voluntarily disclosing material facts in connection with securities transactions, Defendants Infinium, Whitman, Eickbush, Rose, and Johnson assumed a duty to speak fully and truthfully on those subjects.

66.  A duty to disclose the true financial state of Infinium arose because secret information rendered the public statements materially misleading.

The fifth amended complaint also alleged that each of the Individual Defendants owed Plaintiffs "fiduciary duties … first to Plaintiffs as creditors of an insolvent corporation and then as shareholders after the conversion." In dismissing the fifth amended complaint, the district court observed that these allegations did nothing to remedy the fourth amended complaint's failure to state with particularity how the alleged omissions rendered any affirmative disclosure misleading.

On appeal, Plaintiffs' duty to speak argument cites no law and is largely undeveloped. Plaintiffs discuss Infinium's line of credit as an example of an affirmative statement rendered misleading by the omission of pertinent information. They note that the fifth amended complaint alleges, on the one hand, that the Individual Defendants represented at the town hall meetings that Infinium had access to an untapped

$20 million line of credit and, on the other hand, that Plaintiff Wallace saw documents during his April 2015 SEC deposition indicating that Infinium had already drawn down $6 million on that line of credit by the time of the town hall meetings. According to Plaintiffs, they adequately pleaded facts suggesting an omission by alleging this discrepancy between the representations at the town hall meetings and the information the Individual Defendants actually possessed at that time.

Plaintiffs' duty to speak argument falls short for at least two reasons. First, Plaintiffs' allegations that the Individual Defendants "assumed a duty to speak" and "owed Plaintiffs fiduciary duties" are mere legal conclusions that the court need not accept as true. *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). In their briefing to this court, Plaintiffs have presented no legal argument that the facts pled in the complaint gave rise to a legal duty to speak.

Second, Plaintiffs' factual allegations regarding purported omission suffer from the same absence of particularity that plagues the rest of their claims. Taking as an example the allegations surrounding the $20 million line of credit, as Plaintiffs argue in their brief, nothing in the fifth amended complaint associates particular knowledge with particular Individual Defendants. As already discussed above, the allegation pertaining to information learned during Plaintiff Wallace's April 2015 SEC deposition claims that Wallace saw "documents authored, and/or received, by Whitman, Eickbush, Rose, and Johnson" showing that they possessed several pieces of information about Infinium's financial position at the time they made the town hall presentations. Nothing in

that allegation indicates which of the Individual Defendants possessed particular pieces of information that could have rendered his statements at the town hall meetings misleading. In other words, Plaintiffs failed to link any of the alleged omissions to any of the statements made by the Individual Defendants. Consequently, the district court properly concluded that the fifth amended complaint failed to allege with the requisite particularity facts indicating that the Individual Defendants possessed knowledge rendering their affirmative representations misleading at the town hall meetings.

## C. Failure to State a Claim for Breach of Fiduciary Duty and Common Law Fraud

The district court also dismissed Plaintiffs' state law claims for breach of fiduciary duty and fraud. Because Plaintiffs' briefs did not challenge the district court's dismissal of these claims, Plaintiffs have forfeited any opportunity to do so. In any event, we find that the district court did not err in dismissing Plaintiffs' breach of fiduciary duty and common law fraud claims. To state a claim for breach of fiduciary duty under Delaware law, a plaintiff must allege that a fiduciary duty existed and that the defendant breached that duty. *See Stewart v. Wilmington Trust SP Servs., Inc.*, 112 A.3d 271, 297 (Del. Ch. 2015) (citation omitted). A plaintiff must plead the following elements to state a common law fraud claim: "(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless disregard of the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance." *Johnson v. Preferred Prof'l*

*Ins. Co.*, 91 A.3d 994, 1017 (Del. Super. Ct. 2014) (citation omitted). Both claims are subject to Rule 9(b)'s heightened pleading requirements, as they are premised on allegations that the defendants knowingly misled Plaintiffs. Plaintiffs' claims for breach of fiduciary duty and common law fraud fail for the same reasons as their security fraud claim—Plaintiffs have neither pled the required elements of scienter nor alleged the facts underlying these claims with the particularity required by Rule 9(b). The district court therefore correctly concluded that Plaintiffs failed to state a claim for breach of fiduciary duty and common law fraud.

### III. Conclusion

We agree with the district court that Plaintiffs failed to state a claim upon which relief can be granted and find that the district court did not abuse its discretion in denying leave to further amend the complaint, since such leave was never sought. Plaintiffs have not proposed how they might be able to amend their pleading to cure the deficiencies contained in the fifth amended complaint. Under these circumstances, dismissal with prejudice is appropriate. *See Leavell v. Ill. Dep't of Nat. Res.*, 600 F.3d 798, 808 (7th Cir. 2010).

For the foregoing reasons, the district court's decision dismissing the fifth amended complaint with prejudice is AFFIRMED.